UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

OSCAR GARNER,
        Plaintiff,

v.                                                                                         Case No. 16-C-1675

CAPTAIN LEBBEUS BROWN, *et al.*,
        Defendants.

## DECISION AND ORDER

Oscar Garner brings this action under 42 U.S.C. § 1983 against four correctional officers at the Wisconsin Secure Program Facility ("WSPF"), a maximum-security Wisconsin prison. He claims that the defendants punished him for engaging in activity protected by the Free Speech Clause of the First Amendment. Before me now are the parties' cross-motions for summary judgment.

### I. BACKGROUND

Garner has been an inmate at WSPF since September 2013. The events giving rise to his claims arise out of prison administrators' investigation into a matter relating to a different inmate, Dion Matthews,[1] who is believed to be a high-ranking member of the Gangster Disciples prison gang. WSPF currently houses about 95 members of this gang. The members have a history of coercion, intimidation, threats, and starting disturbances within the prison. Def. Prop. Finding of Fact ("PFOF") ¶ 18. According to prison administrators, the gang poses a high risk to the safety of the institution, staff, and other inmates. *Id.*

---

[1] The parties spell Matthews's last name differently. The defendants use two t's, while the plaintiff uses only one. In this opinion, I will use the defendants' spelling.

On November 30, 2015, the warden of WSPF, Gary Boughton, received a letter from Matthews about various conditions within the institution. Matthews told Boughton that he believed the conditions at WSPF were worse than at other maximum-security institutions. He complained about thin mattresses, the lack of higher educational opportunities, and the conduct of staff members. He proposed forming a committee of prisoners who would meet with WSPF staff on a regular basis to share the inmates' concerns.

On December 9, 2015, Boughton wrote a letter to Matthews. Boughton expressed his belief that living conditions at WSPF were similar to living conditions at other institutions. He then tried to respond to Matthews's specific complaints, but he did not agree to take any specific action to address them.

On December 22, 2015, Captain Lebbeus Brown, who is the "security threat groups coordinator" at WSPF, observed an inmate named Zachary Hayes talking with other inmates, including Matthews and Garner, near their cells. Hayes, like Matthews, is believed to be a high-ranking member of the Gangster Disciples, and he was not permitted to be in the area where Brown observed him. Around the same time, prison staff members observed Matthews talking to other inmates in an area that was off-limits for him. Because Hayes and Matthews were observed in unauthorized areas, they were placed in "temporary lockup" until an investigation could be completed.

During a pat-down search of Hayes, prison staff members found gang literature in his shoe. This discovery prompted Brown to search the cells of other inmates, including Matthews. During the search of Matthews's cell, Brown found an envelope that suggested to him that Matthews was communicating with members of the Gangster

Disciples at other prisons. Brown also found two letters written in Matthews's handwriting. The first was the letter that Matthews had sent to Warden Boughton at the end of November. The second was a letter dated September 27, 2015, and it made reference to a "proposal . . . being brought forth by the prisoners of WSPF." Def. PFOF ¶ 37.

Upon finding the letters, Brown began to suspect that Matthews was circulating a group petition among the inmates at WSPF. If so, Matthews would have violated a regulation promulgated by the Wisconsin Department of Corrections prohibiting inmates from participating in certain forms of "group resistance and petitions." *See* Wis. Admin. Code § DOC 303.24. Among other things, the regulation makes it a disciplinary infraction to join in, or solicit another to join in, any group petition or statement. *Id.* § DOC 303.24(2). Captain Brown explains the rationale for this rule as follows:

> Permitting group complaints or statements outside of the ICRS[2] is a threat to security of the institution and can seriously disrupt the normal operation of the institution. Group petitions generate intimidation and coercion as inmates try to force others to join them in their demands. These types of group petitions have been known to create riot situations within the institutions, disrespect for staff and institution rules, and violent confrontations.

Def. PFOF ¶ 57.

Brown interviewed Matthews about the letters found in his cell. Matthews denied that the second letter, purporting to be brought on behalf of all prisoners of WSPF, was a group petition. Instead, Matthews claimed, it was a draft of the letter he eventually

---

[2] As discussed in more detail below, the regulation excepts group complaints filed through the DOC's inmate complaint review system, or "ICRS", from the prohibition on group petitions. *See* Wis. Admin. Code §DOC 303.24(2)(c).

sent to the warden at the end of November. Matthews said that no one else was involved with the letter, and then he attempted to walk out of the interview. *Id.* ¶ 38. At this point, Brown suspected that the Gangster Disciples were attempting to organize some type of disturbance at WSPF. Brown knew that the leader of the Gangster Disciples at WSPF—an inmate named Glenn Turner—was critical of the conditions of solitary confinement at WSPF, and he suspected that Turner was using Matthews to organize a disturbance that would attract media attention to their cause. *Id.* ¶ 39.

It was at this point that prison administrators turned their attention to Garner. As Brown continued to investigate, he discovered communications between Turner and Garner. Although Brown did not believe that Garner was a member of the Gangster Disciples, he decided to search his cell. The search occurred on December 28, 2015. During the search, Brown found three letters. The first was a copy of Matthews's letter to Warden Boughton. The second was a copy of the letter found in Matthews's cell that was dated September 27, 2015. The third letter is the one that precipitated this suit.[3] The letter was typed and dated December 21, 2015. It was addressed to Captain Brown, to another captain at WSPF, and to "WSPF Administration." Def. PFOF ¶ 44. It was from "the prisoners of WSPF," *id.*, but was signed by only Matthews, *id.* ¶ 46. The

---

[3] As I discussed in an earlier order, a WSPF employee who is not a defendant in this case destroyed the letters at issue. Order of Aug. 22, 2017, ECF No. 41. The defendants have described the contents of the letters, to the extent that they can recall them, in their declarations. However, Garner claims to have found a copy of the December 21 letter, and he has submitted it to the court. *See* ECF No. 40. The defendants do not concede that this copy is authentic, *see* Reply Br. at 1 n.1, but neither do they point to any way in which the copy differs from their recollections of the letter. In this order, I will rely on the defendants' descriptions of the letter rather than the copy supplied by Garner. However, this does not make a difference to the outcome of the parties' motions for summary judgment, as the letter and the defendants' recollections of it seem to coincide.

4

letter used the terms "we propose" and "we ask," which are terms that Brown considered to be "demands that are given to address a disturbance." *Id.* ¶ 44.

Brown interviewed Garner about the letters found in his cell. Garner told Brown that he received the letters from Matthews, and that Matthews wanted Garner to review them and make them sound better, as Garner was a known jailhouse lawyer. *Id.* ¶ 47. Garner claimed to have typed the December letter based on conversations he had with Matthews.

At this point, Brown suspected that Matthews and Garner "were participating in unsanctioned activity occurring within the institution." *Id.* ¶ 50. On December 28, 2015, the same day as the search of his cell, Garner was placed into temporary lockup while Brown continued to investigate. On January 19, 2016, Brown issued Garner a conduct report for violating the DOC regulation against group resistance and petitions.[4] The conduct report also charged Garner with other disciplinary infractions that were discovered during the search of his cell, such as possession of pornography. Brown also issued Matthews a conduct report for his part in these events.[5]

In response to the conduct report, Garner claimed that the December letter did not constitute a group petition because it was intended as an attempt to informally resolve an inmate "group complaint" through the DOC's Inmate Complaint Review System ("ICRS"). The ICRS is the DOC's internal system for addressing inmate

---

[4] Although Brown signed the conduct report, it was handwritten by one of his colleagues, Shelly Hill, whom Garner has also named as a defendant to this suit.

[5] Matthews has filed his own lawsuit under § 1983 based on these events, and that suit is pending in the Western District of Wisconsin. *See Mathews v. Brown*, No. 16-cv-1650, 2017 WL 3034368 (W.D. Wis. July 17, 2017).

complaints about prison conditions. *See generally* Wis. Admin. Code ch. DOC 310. An inmate must raise a complaint about prison conditions through this system before filing a lawsuit. *Id.* § DOC 310.05. A typical ICRS complaint will be filed by one inmate and raise one issue for resolution. However, DOC regulations allow inmates who have a common complaint to file as a group using a single complaint form. *Id.* § DOC 310.10. The DOC regulations state that a group complaint filed through the ICRS cannot be deemed a group petition for purposes of the regulation proscribing group resistance and petitions. *See id.* § DOC 310.10(7); § DOC 303.24(2)(c).

Brown explains in his declaration that he did not think the December 2015 letter prepared by Garner and Matthews was a group complaint intended to be filed through the ICRS. Def. PFOF ¶ 58. He notes that the letter was not written on an inmate-complaint form, and that it was not addressed to WSPF's inmate-complaint examiner. Further, because the letter purported to be from the entire inmate population and was passed between cells, it had the appearance of a group petition. Brown concluded that because Matthews, a high-ranking member of the Gangster Disciples, was behind the petition, it may have been part of a plan to incite a disturbance or riot within the institution. *Id.* ¶¶ 59–60, 72.

Garner concedes that the December 2015 letter was not actually a group complaint that Matthews intended to file through the ICRS. Rather, he contends that the letter was intended to be Matthews's attempt to informally resolve the grievance before filing it as a group complaint. This is a reference to the fact that inmate-complaint examiners will often reject an inmate's formal complaint if it appears that the inmate has not attempted to resolve the issue informally with a staff member. *See* Wis.

Admin. Code § DOC 310.09(4) ("Prior to accepting the complaint, the ICE may direct the inmate to attempt to resolve the issue."). Essentially, then, Garner claims that he was helping Matthews draft a letter to WSPF administration that would serve as his attempt at informal resolution should he later decide to bring a formal ICRS group complaint on behalf of all inmates at the institution.

After Brown issued Garner the conduct report, WSPF's security director, Mark Kartman (who is also a defendant to this suit), reviewed the report and allowed the charges to proceed as a "major offense" because the letter had the potential to create a serious disruption at the institution. Def. PFOF ¶ 74. Garner remained in temporary lockup pending a hearing on the charges.

Under the institution's rules governing temporary lockup, prison administrators could hold Garner in temporary lockup without a hearing for only a limited time. On January 25, 2016, Kartman realized that this time was almost up, and he directed the officer in charge of conducting Garner's hearing, Joseph Cichanowicz, to hold the hearing immediately. Cichanowicz held the hearing that same day. Because Captain Brown was not on duty at the time of the hearing, he was not available to give testimony. But Garner had made a request to confront Brown at the hearing, and he asked that the hearing be adjourned until Brown could attend. Cichanowicz denied Garner's request and proceeded with the hearing. He found Garner guilty of violating the regulation against group resistance and petitions, and also found him guilty on the pornography charge. Cichanowicz found Garner not guilty on a third charge relating to "enterprises and fraud." Cichanowicz issued Garner a disposition of 120 days in

"disciplinary separation," which apparently is a form of confinement that differs from temporary lockup. *See* Def. PFOF ¶¶ 2, 100.

On January 25, 2016, Garner was placed into disciplinary-separation status in restrictive housing. *Id.* ¶ 2. However, on January 26, 2016, Warden Boughton received a letter from Garner in which Garner noted that Brown did not attend the disciplinary hearing. Boughton determined that Garner had a due-process right to have the officer who wrote the conduct report attend the hearing. For this reason, he dismissed the conduct report and the disposition and ordered Garner returned to the general population. Garner was returned to the general population on January 27, 2016. *Id.*

Garner now brings this suit under § 1983 against Brown, Hill, Kartman, and Cichanowicz. He claims that the December 2015 letter was a form of expression protected by the Free Speech Clause of the First Amendment, and that therefore the punishment he received for authoring and possessing it constituted retaliation for engaging in protected activity.[6] He requests damages to compensate him for the 30 days he spent in temporary lockup and disciplinary separation in connection with the conduct report.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I take evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror

---

[6] In his complaint, Garner also alleged a claim for violation of the Equal Protection Clause, but he has since abandoned that claim.

could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

Garner's claim is turns on whether the conduct for which he was punished—authoring and possessing the December letter—constitutes protected expression. If it does not, then Brown and the other officers could not have violated Garner's First Amendment rights. If the conduct was protected, then Garner will have established that his rights were violated. Whether the speech was protected turns on the standard established in *Turner v. Safley*, 482 U.S. 78, 89 (1987). *See Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010); *Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009). Although the *Turner* standard consists of multiple factors, in the present case the parties focus on the first factor, under which a decision by prison administrators that impinges on a prisoner's constitutional rights will be deemed valid if it is "reasonably related to legitimate penological interests." *Watkins*, 599 F.3d at 794; *see also Van der Bosch v. Raemisch*, 658 F.3d 778, 785 n.6 (7th Cir. 2011) (noting that although each of the *Turner* factors is relevant in assessing the reasonableness of a prison regulation, the first factor serves as a threshold, and the district court need not explicitly articulate its consideration of the other factors).

In the present case, the defendants contend that punishing Garner for authoring the December letter was related to the prison's interest in institutional security. They state that the letter appeared to be a group petition, and that such petitions pose a security threat because (a) they can lead to intimidation of other inmates, as the circulators try to force others to join the petition, and (b) they can lead to riots, disrespect for staff, and violent confrontations. Def. PFOF ¶ 57. The defendants also

note that this particular petition appeared to be connected to the Gangster Disciples, a prison gang known for causing disruptions, in that Matthews, a high-ranking member of the gang, was behind the petition and appeared to be in communication with other members of the gang who may have been planning a disruption at the institution to attract media attention. *Id.* ¶¶ 18–22, 39, 50, 72. Thus, the defendants argue, their actions to punish those responsible for the letter were reasonably related to the prison's interest in institutional security.

There is no doubt that the security of the institution is a legitimate penological interest. Indeed, the Supreme Court has described institutional security as "perhaps the most legitimate of penological goals." *Overton v. Bazzetta*, 539 U.S. 126, 133 (2003). Garner contends that the letter could not be seen as posing a security concern because it did not contain any demands; rather, he contends, the letter simply made requests and proposals, in that it used terms such as "we ask" and "we propose." However, a group petition need not make an express demand in order to present a security concern. As described above, the defendants have determined that a group petition that merely makes a request or a proposal can pose a threat because it may lead to pressure on other inmates to join the petition and may lead to riots or other disruptions. Moreover, Brown considered the use of the terms "we propose" and "we ask" to be veiled demands that could have been calls to start a disturbance. Def. PFOF ¶ 44. He also pointed to other aspects of the letter that raised red flags: it was addressed to staff members known to deal with gang activity and thus could have been an attempt to speak on behalf of a gang, *id.* ¶ 67; the letter purported to be from "an unnamed mass of inmates," which can be seen as threatening because individuals are trying to hide

their identities, *id.* ¶ 69; inmates demanding anything from prison staff as a group, especially an anonymous group, can be taken as threatening and in opposition to authority, *id.* ¶ 71. Finally, Brown knew that Matthews, a member of a prison gang, was behind the letter, and therefore he reasonably suspected that the gang was using the letter as part of a plan to start a disturbance.

It may be true, as Garner contends, that the letter was not intended to be threatening and that it was unlikely to lead to a disturbance. However, courts must accord "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132; *accord Van der Bosch*, 658 F.3d at 786. "Not being experts in prison administration, but aware of the security problems in American prisons, judges sensibly defer within broad limits to the judgments of prison administrators." *Toston v. Thurmer*, 689 F.3d 828, 830 (7th Cir. 2012). Here, the defendants have articulated reasons that support their conclusion that the December letter posed a threat to prison security. Even if the connection between the letter and a potential disturbance may seem tenuous, it is not so implausible that I can deem the defendants' concerns groundless. *See id.* at 830–31. Therefore, I must conclude that the letter was inconsistent with legitimate penological interests and did not constitute protected speech.

Garner next contends that the defendants wrongly determined that the December letter was a group petition rather than an attempt to raise a group complaint through the ICRS. As I noted in the background section, under the DOC's regulations, group complaints filed through the ICRS are not considered to be group petitions, and an

11

inmate cannot be punished for filing a group complaint. Moreover, before the inmate-complaint examiner will accept an inmate complaint, he or she will require the inmate to attempt to informally resolve the subject of the complaint with an appropriate staff member. Here, Garner contends that the December letter was intended to be Matthews's attempt to informally resolve a group complaint, and that therefore Garner should not have been punished for helping him prepare that letter.

There appears to be some tension between the DOC's permitting inmates to file group complaints through the ICRS and its proscription of group petitions. Although the regulations expressly state that a group complaint shall not be considered a group petition, they do not also state that an inmate's attempt to informally resolve a group complaint shall not be considered a group petition. Yet it seems that any written attempt to informally resolve a group complaint will also qualify as a group petition, in that the attempt will make a request or demand on behalf of multiple inmates. Thus, the regulations do not clearly explain how an inmate or group of inmates may attempt to informally resolve a group complaint without violating the rule against group petitions.

However, this tension in the regulations does not affect the particular First Amendment claim that Garner is pursuing in this case. The question presented is whether the defendants violated the Free Speech Clause of the First Amendment by punishing Garner for his involvement with the December letter. Whether they did turns on whether they have shown that the punishment was reasonably related to their legitimate penological interests. As I have already explained, the defendants have shown that it was, in that they have shown that they reasonably concluded that the letter was being circulated by a prison gang attempting to create a disturbance. Even if

Garner intended the letter to be an attempt to informally resolve a group complaint, rather than an unlawful group petition, the fact would remain that the defendants reasonably concluded that the letter was a threat to prison security. And under the *Turner* standard, it is the reasonableness of the defendants' conclusion, rather than Garner's subjective intent, that determines whether Garner's speech was protected.

The tension between the regulations might matter if Garner had brought a claim alleging that the regulations did not give him fair notice that the letter he drafted could expose him to punishment. Such a claim would arise under the Due Process Clause rather than the Free Speech Clause of the First Amendment. *See Rios v. Lane*, 812 F.2d 1032, 1037–40 (7th Cir. 1987). But Garner has not brought a due-process claim. Moreover, a due-process claim would likely fail. To establish such a claim, Garner would first have to show that he was deprived of a liberty interest. But the only punishment Garner received for possessing the letter was 30 days in segregation, and it is well established that such a short time in segregation does not deprive a prisoner of a liberty interest, unless the conditions in segregation were atypically harsh. *See Beamon v. Pollard*, No. 17-1269, 2018 WL 1001606, *2 (7th Cir. Feb. 21, 2018) (collecting cases holding that serving several months in segregation does not implicate a liberty interest unless the prisoner establishes that the conditions in segregation were atypical).

The tension between the regulations also might matter if Garner had brought a claim for injunctive relief, alleging that the tension was chilling his speech, *i.e.*, causing him to self-censor and not engage in protected speech for fear that he will again be punished for circulating a group petition. *See Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 835 (7th Cir. 2014) (recognizing that the vagueness of a regulation of

expressive activity may be grounds for mounting a facial challenge to the regulation under the First Amendment). But Garner seeks only damages based on the punishment he already received for engaging in speech. *See* Am. Compl. at 4. He has not alleged a claim for prospective relief based on the regulations' ongoing effect on his rights. Thus, I need not decide whether the regulations are impermissibly vague.

In short, because the defendants reasonably concluded that the December 2015 letter posed a threat to institutional security, the letter was not protected speech. Therefore, Garner cannot prevail on his claim that the defendants punished him in violation of the Free Speech Clause of the First Amendment. My conclusion that the letter was not protected speech makes it unnecessary to consider the defendants' other arguments, including that they are entitled to qualified immunity, that Garner cannot recover compensatory or punitive damages, and that Hill was not personally involved in issuing the conduct report.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the plaintiff's motion for summary judgment (ECF No. 19) is **DENIED** and that the defendants' motion for summary judgment (ECF No. 43) is **GRANTED**. The Clerk of Court shall enter judgment for the defendants on the merits.

**IT IS FURTHER ORDERED** that plaintiff's motion to strike (ECF No. 62) and his motion for evidentiary hearing (ECF No. 65) are **DENIED**.

This order and the judgment to follow are final. A dissatisfied party may appeal this decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. I

may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A).

Under certain circumstances, a party may ask me to alter or amend my judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. I cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. I cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2).

I expect parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin, this 2nd day of March, 2018.

/s Lynn Adelman
LYNN ADELMAN
District Judge